1
2
3
4
5
6
7
8
# UNITED STATES DISTRICT COURT

9
## SOUTHERN DISTRICT OF CALIFORNIA

10
| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>                                      Plaintiff,<br><br>    vs.<br><br>LAWRENCE PRESTON SIEGEL<br>(a/k/a Larry Lave, Yehuda Lave, and<br>Larry Easy)<br><br>                                      Defendant. | CASE NO. 15CV643-GPC(WVG)<br><br>**ORDER GRANTING PLAINTIFF'S MOTION FOR DEFAULT JUDGMENT**<br><br>[Dkt. No. 12.] |

16
17      Before the Court is Plaintiff's motion for default judgment against Defendant
18  Lawrence Preston Siegel. (Dkt. No. 12.) No opposition has been filed. After a review
19  of the complaint, the moving papers and the applicable law, the Court GRANTS
20  Plaintiff's motion for default judgment.

21
## Procedural Background

22      On March 23, 2015, Plaintiff United States of America filed a complaint against
23  Defendant Lawrence Preston Siegel seeking a permanent injunction enjoining Plaintiff
24  from preparing tax returns for others; operating owning or working in any business that
25  provides tax advice; and providing tax advice for compensation or any promise of
26  compensation pursuant to 26 U.S.C. ("I.R.C") §§ 7402, 7407, 7408.  (Dkt. No. 1,
27  Compl.)  The Court granted the United States' ex parte motion for alternative service
28  of process. (Dkt. No. 5.)  A request for entry of clerk's default and default was entered

on August 3, 2015.  (Dkt. Nos. 8, 9.)  Subsequently, on September 2, 2015, Plaintiff filed a motion for default judgment.  (Dkt. No. 12.)  Defendant has not filed a response.

**Factual Background**

According to the Complaint, in 2008, Siegel purchased the tax practice of Peter A. Rice and Associates, including the practice's client list.  (Dkt. No. 1, Comp. ¶ 15.)  The practice was located in San Diego and has operated the tax practice under multiple d/b/a names such as "Rice and Associates", "Rice and Lave", "Pete Rice and Larry Lave", "Larry Lave, J.D., CPA Tax and Accounting", and "Lave Dash and Clark." (Id.)  Since 2008 to the present, Siegel has promoted tax fraud schemes and prepared fraudulent tax returns for his customers.  (Id. ¶ 16.)  Siegel promotes his tax fraud schemes to self-employed individuals and high earners in California who own profitable businesses, as well as customers in locations throughout the United States. (Id. ¶ 17.)   Siegel primarily communicates with his customers remotely and/or electronically, which allows him  to more easily operate his tax practice from any location he chooses.  (Id. ¶ 18.)

In 1980, Siegel obtained a C.P.A. license in  California and, in 1982, and admitted to the State Bar of California to practice law.  (Id. ¶ 7.)  In 1994, 1995, 1998, and 1999, Siegel was convicted of federal crimes for: (a) tax evasion; (b) subscribing false tax returns; (c) making false statements to obtain furlough passes while serving his sentence for his 1994 conviction; (d) bail jumping; (e) fraudulent use of social security numbers in order to open bank accounts and with intent to deceive multiple financial institutions; (f) causing a financial institution to file false Currency Transaction Reports with the IRS in connection with a payment or transfer of currency; (g) making a false statement in an application for a U.S. passport with the intent to induce and secure the issuance of the passport; and (h) fraudulent use of an instrument purporting to be a passport.  (Id. ¶¶ 9, 10.)

On June 23, 1994, Siegel resigned from the State Bar of California with charges pending against him, and has been ineligible to practice law in any state. (Id. ¶ 11.) In

[15cv643-GPC(WGV)]

1997, the Board of Accountancy for the California Department of Consumer Affairs revoked Siegel's C.P.A. license for committing crimes "related to the qualifications, functions and duties of a certified public accountant." (Id. ¶ 12.)

Siegel's illegal conduct subject to injunction in this action includes promotion and implementation of an out-of-state "C" corporation scheme, (id. ¶¶ 19-36), preparation of fraudulent tax returns, (id. ¶¶ 37-44), assisting customers to evade payment of employment taxes, (id. ¶¶ 45-55), delaying and obstructing IRS examinations of his customers, (id. ¶ 69), filing customer tax returns without his customers' authorization, (id. ¶¶ 70-71), as well as misrepresenting his credentials, using false identities, and the unauthorized practice of law, (id. ¶¶ 56-68).

A.    Out of State "C" Corporation Scheme

Siegel advises his customers to form and personally assists them to establish their businesses as "C" corporations, typically under Nevada law, where the customers have no contacts. (Id. ¶¶ 19, 22.) These "C" corporations are used as instruments by Siegel to illegally reduce or eliminate his customers' reported tax liabilities. (Id. ¶ 19.) In some instances, Siegel improperly treats multiple, unrelated businesses, each owned by different Siegel customers, as a single "community" "C" corporation for tax purposes.   (Id. ¶ 20)    Siegel has prepared tax returns for these "community corporations" that improperly assign customer income to the "community corporation" and co-mingle reportable financials among the unrelated businesses. (Id.) Siegel does this to illegally reduce the reported tax liabilities of his customers, including claiming improper business expense deductions. (Id.) Siegel also establishes out-of-state "C" corporations for use by a single customer. (Id. ¶ 21.) He prepares and files documents used to establish these out-of-state "C" corporations, oversees recurring filings with state entities to maintain the corporate status of the companies, assists customers to establish bank accounts for the "C" corporations, and in most instances names himself as an officer of these entities. (Id. ¶¶ 23-24.) In some instances, Siegel purports to maintain corporate records of the companies and oversees or assists his customers with

[15cv643-GPC(WGV)]

1    financial record-keeping for the companies.  (Id. ¶ 24.)

2         Siegel advises his customers that the "C" corporations he establishes have no

3    business purpose. (Id. ¶ 26.) He falsely advises customers that by establishing an

4    out-of-state "C" corporation, their entire home becomes an out-of state business office

5    with living quarters, which can then pay for the customer's personal expenses incurred

6    while living in the purported out-of-state business office.  (Id. ¶¶ 27, 29.)  Siegel

7    contends, falsely, that unlike a salary paid by the corporation to its employees, these

8    payments by the corporation for customer personal expenses do not need to be reported

9    as compensation on the customer's individual tax returns and can be deducted as

10   compensation on the customer's individual tax returns and can be deducted as business

11   expenses on "C" corporation tax returns.  (Id. ¶¶ 27, 37-38.)

12        Siegel further falsely advises customers that they can characterize their home as

13   an out-of state business office by creating a fictitious employment obligation between

14   the individual customer and their "C" corporation.  (Id. ¶ 28.)  For example, Siegel

15   falsely advises his customers that to treat their home as an out-of-state corporate office

16   for federal tax purposes, the customer's Nevada "C" corporation (i.e., an entity entirely

17   controlled by Siegel and the customer) must require as a condition of employment that

18   its corporate officers (i.e., the same Siegel customer) live in the customer's California

19   home while working away from the corporation's purported home state of Nevada (i.e.,

20   a state where the Siegel customer typically has no actual contact).  (Id.)  Siegel has

21   falsely advised customers by e-mail that this scheme is valid because: (a) the

22   customers, as business owners, are necessarily "on call 24/7" while living or working

23   from their out-of-state "business office;" (b) the customers can deduct [their] rent and

24   other expenses through [their] corporation when [they] are on call for that corporation";

25   and (c) while "the internet was just getting hot for being on call" in 2002, "[w]ithout

26   a question in 2013 when we are truly on call 24/7 working at home is a deduction for

27   the corporation."  (Id. ¶ 31.)  Siegel even provided his customers with a "memo" he

28   sent to his customers where he falsely advised, leaving blanks for the applicable

customer names and missing legal authority, that:

> As noted by _____ himself, "working at [a] business office in which he also stays" is the only way his corporation can efficiently operate it's [sic] business which is on Internet time 24/7/365. Thus requiring the Corporation's key employee(s) to live on the Corporation's business premises makes good business sense.

(Id. ¶ 32.) Siegel also informed his customers that he "will be coaching [them] before [IRS] interview[s]" to "help [customers] to answer the questions porperly," should the IRS question the "C" corporation. (Id. ¶ 30.)

Siegel falsely told a colleague that this tax benefit can be substantial because "[t]he housing can [b]e luxurious and cost thousands a [] month. There is an assumption that corporations don't waste money." (Id. ¶ 34.) When Siegel's customers ask for details and an explanation about what he is doing on their behalf, Siegel avoids providing them with information. (Id. ¶ 36.) Instead, Siegel falsely assures his customers that, among other things: (i) he is a qualified C.P.A., licensed tax attorney, and tax expert with years of experience; (ii) he cannot fully educate these customers who lack tax expertise; and (iii) they should simply trust him. (Id.)

**B**.    **Fraudulent Tax Returns**

Siegel uses the out-of-state "C" corporations he establishes for customers to improperly reduce their reported tax liabilities and to claim fraudulent tax refunds on returns he either prepares or directs his employees to prepare. (Id. ¶ 37.) Specifically, Siegel falsely assures customers that by characterizing their homes as offices, this fiction allows them to deduct personal expenses, such as meal costs, utility bills, payments for their home, and vehicles driven at least in part for personal use, as business expenses on the "C" corporation tax returns that Siegel prepares or directs his employees to prepare. (Id.) Similarly, Siegel falsely advises that these personal expenses paid by the customers' "C" corporations do not need to be reported as compensation on individual income tax returns that Siegel or his employees prepare. (Id.) Siegel claims improper business expense deductions on Schedule C of customer individual tax returns. (Id. ¶¶ 38-43.) Siegel fraudulently attempts to conceal the

1   improper deduction of personal expenses of his customers on "C" corporation tax
2   returns by lumping the bogus deductions into a single, large deduction and categorizing
3   them as supplies or office expenses on corporate tax returns he prepares.  (Id. ¶ 41.)
4   For example, on the "C" corporation tax return for one customer, Siegel claimed
5   deductible business expenses for a nonexistent insurance warranty and a fictitious
6   employee benefit plan.  (Id. ¶ 42.)

7   **C.   Evading Payment of Employment Taxes**

8          Siegel advises and assists customers to use their out-of-state "C" corporations
9   to mischaracterize income paid from the "C" corporation to individual customers as
10  royalties, consulting fees, or rental payments.  (Id. ¶ 45.)  Siegel falsely claims that by
11  mischaracterizing income from "C" corporations to individual customers, customers
12  can transfer funds collected by the "C" corporation from business operations to the
13  individual customer, while exempting those payments to the customers from federal
14  employment taxes.  (Id.)  To mischaracterize income as royalties, Siegel falsely advises
15  his customers that their out-of-state "C" corporations can acquire customers'
16  "intellectual property," which according to Siegel includes the customers' professional
17  skills and expertise.   (Id. ¶ 47.)  For the "C" corporation to purportedly accomplish
18  this, Siegel improperly advises his customers to enter into "License Agreements" with
19  their "C" corporation, which Siegel has drafted, for the corporation to purportedly
20  acquire a "lease" for control over the customers' professional skills and knowledge.
21  (Id. ¶¶ 47-48.)  Under this sham arrangement,  Siegel falsely contends that customers
22  can receive payments from their "C" corporation and classify these sums on "C"
23  corporation returns as "royalties," which Siegel erroneously contends makes the
24  payments exempt from employment taxes.  (Id. ¶ 47.)  Siegel knows that characterizing
25  income as royalties under sham "License Agreements" is improper.  (Id. ¶ 53.)  In
26  2014, when asked by a colleague about this practice, Siegel asserted that
27  mischaracterizing income as royalties is "not a problem unless the IRS finds it."  (Id.)
28  Moreover, he also has customers evade payment employment taxes by characterizing

the compensation they obtain from their "C" corporation as purported rental payments by the "C" corporation for use of the customer's home as a corporate "office." (Id. ¶ 54.) Siegel also prepares or direct his employees to prepare tax returns that falsely mischaracterize his customers' income, which is subject to employment tax, as "consulting" fees from the "C" corporation. (Id. ¶ 55.) To reduce or eliminate the customers' individual tax liability, Siegel then claims bogus deductions, such as supplies, office, and contract labor expenses on Schedule C of the customers' individual tax returns. (Id.)

**D.     Delay and Obstruction of IRS Examinations**

During IRS audits of Siegel's customers, when the IRS requested documents to substantiate positions Siegel claimed on customers' tax returns, Siegel failed to provide the necessary documentation and attempted to delay and obstruct the IRS examinations. (Id. ¶ 69.) For example, Siegel: (a) told a customer that he would "inundate the IRS" with documentation in order to obstruct their audit; (b) knowingly provided false corporate documents and bogus contracts to the IRS in order to deceive auditors; and (c) lied to IRS officials during U.S. Tax Court litigation when asked to confirm information on behalf of his customers. (Id.)

**E.     Filing Tax Returns Without Customer Authorization**

On at least two occasions, Siegel filed tax returns for customers without authorization. (Id. ¶ 70.) In 2013, he filed a tax return for a "C" corporation without reviewing the return with the customer or requesting permission to file it. (Id.) Similarly, Siegel filed an individual 2009 tax return for another customer without her authorization. (Id. ¶ 71.) Prior to filing that return, Siegel recommended to that customer that she fail to report over $80,000 of alimony income in order to evade paying federal income tax. (Id.) Siegel advised the customer that if the IRS found out about the unreported alimony payments, they could address the matter at that time. (Id.) The customer informed Siegel that she wanted to report these alimony payments on her tax return and did not want Siegel to file her 2009 tax return. (Id.) Siegel ignored her

and filed the return without her permission and without reporting her alimony payments. (Id.)

## F.    Misrepresentation of Credentials, Use of False Identities, and Unauthorized Practice of Law

Siegel has repeatedly and falsely represented to customers, government agents, and the public-at-large that he is a licensed attorney and/or C.P.A. even though he is no longer licensed as a CPA or as an attorney.  (Id. ¶ 56.)  Siegel has also concealed his legal name from customers and assumed false identities in order to make it difficult to discover his true professional and criminal background. (Id.)  Siegel illegally practices as a C.P.A. and lawyer without any licenses.  (Id.)  To solicit business, Siegel falsely represents to the public that he is licensed to practice law, has a C.P.A. license, and has falsely claimed to customers that he is a former IRS employee.  (Id. ¶¶ 57, 58, 61.) Siegel also improperly encourages his customers to hire him to perform legal services. (Id. ¶ 62)  To conceal his background and deceive customers, Siegel has fabricated professional certificates in his business office, including a purported C.P.A. license and certificate from the Supreme Court of the State of California for admission as an "Attorney and Counselor at Law." (Id. ¶ 59.)  Both certificates conceal his actual legal name, Lawrence Preston Siegel, and display the alias "Lawrence Preston Lave." (Id.) Even after his customers learned of Siegel's multiple aliases during IRS audits of tax returns that Siegel prepared, Siegel continued to lie to his customers about his true identity. (Id. ¶ 66.)  In 2013, when two customers asked Siegel about his multiple aliases, Siegel falsely responded that the IRS was "just making stuff up." (Id.) Similarly, in 2013, when another customer asked Siegel why the IRS was asking questions about their understanding of Siegel's qualifications as a lawyer, Siegel falsely told them that he simply owed membership dues to the California bar, when in fact, he resigned in 1994 with charges pending against him.  (Id.)  Siegel also falsely represented his qualifications and identity to the IRS.  (Id. ¶¶ 63, 64, 67.)  In 2010 and 2011, Siegel submitted forms to the IRS to represent his customers under IRS audit,

signed by him under penalty of perjury, which falsely claimed he was a licensed C.P.A. in California. (Id. ¶ 63.) Siegel also routinely lists false identifiers on tax returns he prepares and files with the IRS by using the preparer tax identification numbers ("PTINs") and electronic filing identification numbers ("EFINs") of others in order to evade detection. (Id. ¶ 67.) In addition, Siegel has forged the signatures of other licensed attorneys on correspondence he sent to the IRS on behalf of his customers and impersonated these attorneys on telephone calls with the IRS. (Id. ¶ 64.) Siegel is not eligible to appear as counsel for his customers in federal court, but nonetheless drafted and filed documents in U.S. Tax Court by impersonating licensed attorneys on behalf of at least one customer. (Id. ¶ 65.) Siegel repeatedly deceived this customer, the IRS, and the Tax Court during a proceeding Siegel initiated on the customer's behalf and, on at least one occasion, forged the customer's signature on a document Siegel filed in U.S. Tax Court. (Id.) Siegel understood that concealing his true identity and felony convictions, as well as the loss of his law and C.P.A. licenses, was important to maintaining his tax practice and convincing customers that his tax fraud schemes were actually legal. (Id. ¶ 68.) As Siegel wrote in an April 16, 2014 e-mail to a colleague regarding their professional dealings: "Look . . . I guess it is hard to believe I am telling the truth, since I was forced to skirt the truth the last 20 years because of what they did to me the first time 20 years ago." (Id.)

**Discussion**

**A.    Motion for Default Judgment**

Federal Rule of Civil Procedure 55 provides that "[w]hen a party against whom a judgment for affirmative relief is sought has failed to plead or otherwise defend . . . . the clerk must enter the party's default." Fed. R. Civ. P. 55(a). Here, Plaintiff filed a request for entry of default and default was entered on August 3, 2015. (Dkt. Nos. 8, 9.) After default is properly entered, a party seeking relief other than a sum certain must apply to the Court for a default judgment. Fed. R. Civ. P. 55(b).

The Ninth Circuit looks to seven factors to assist the court in determining

whether default judgment is appropriate.  The seven factors are:

> (1) the possibility of prejudice to the plaintiff;
> (2) the merits of the plaintiff's substantive claim;
> (3) the sufficiency of the complaint;
> (4) the sum of money at stake in the action;
> (5) the possibility of a dispute concerning material facts;
> (6) whether the default was due to excusable neglect; and;
> (7) the strong policy underlying the Federal Rules of Civil Procedure favoring decisions on the merits.

Eitel v. McCool, 782 F.2d 1470, 1471-72 (9th Cir. 1986).  Upon default, the factual allegations in the complaint are taken as true, except those related to the amount of damages.  Geddes v. United Fin. Grp., 559 F.2d 557, 560 (9th Cir. 1977); see Fed. R. Civ. P. 8(b)(6).  Allegations of damages must be proven.  Id.  The decision to grant or deny default judgment is within the discretion of the district court.  Eitel, 782 F.2d at 1471.

**B.    Eitel Factors**

**1.    Prejudice to the Plaintiff**

Under the first factor, the Court must examine whether Plaintiff will be prejudiced if the Court denies default judgment.  See Eitel, 782 F.2d at 1471.  Since default judgment is the only means to compensate Plaintiff, denial of Plaintiff's request for default judgment will effectively immunize Defendant from liability and leave Plaintiff without redress.  See Amini Innovation Corp. v. KITY Int'l Mktg., 768 F. Supp. 2d 1049, 1054 (C.D. Cal. 2011) (finding prejudice to plaintiff where "a default judgment is the only means available for compensating [p]laintiff for [d]efendants' violations"); Wecosign, Inc. v. IFG Holdings, Inc., 845 F. Supp. 2d 1072, 1081 (C.D. Cal. 2012) (same); Craigslist, Inc. v. Naturemarket, Inc., 694 F. Supp. 2d 1039, 1054–55 (N.D. Cal. 2010) (same).  Plaintiff contends it will suffer prejudice because denial of a judgment by default would leave it without a remedy and would harm the Government, Siegel's customers, and the public.  Because failure to enter default judgment for Plaintiff would be prejudicial, this factor weighs strongly in favor of default judgment.

/ / / /

[15cv643-GPC(WGV)]

2. **Merits of the Case and Sufficiency of the Complaint**

Under the second and third factors, the Court must examine whether Plaintiff has pled facts sufficient to establish and succeed on its claims. See Eitel, 782 F.2d at 1471.

i. **I.R.C. § 7408**

Plaintiff's first cause of action seeks an injunction pursuant to I.R.C. § 7408 based on violations of I.R.C. §§ 6700 and 6701.

I.R.C. § 7408 authorizes the Court to enjoin individuals from engaging in conduct who are subject to penalty under I.R.C. §§ 6700 and 6701, and where injunctive relief is appropriate to prevent recurrence of such conduct. I.R.C. § 7408.

The government has the burden of proving five elements to obtain an injunction under § 7408 for a violation under § 6700. The five elements are:

> (1) the defendants organized or sold, or participated in the organization or sale of, an entity, plan, or arrangement; (2) they made or caused to be made, false or fraudulent statements concerning the tax benefits to be derived from the entity, plan, or arrangement; (3) they knew or had reason to know that the statements were false or fraudulent; (4) the false or fraudulent statements pertained to a material matter; and (5) an injunction is necessary to prevent recurrence of this conduct.

U.S. v. Estate Pres. Servs., 202 F.3d 1093, 1098 (2000). The "traditional requirements for equitable relief need not be satisfied since Section 7408 expressly authorizes the issuance of an injunction." Id.

The complaint alleges that Plaintiff created "C" corporations for his customers in Nevada, where customers have no contacts, to illegally reduce or eliminate his customer's reported tax liabilities. (Dkt. No. 1, Compl. ¶¶ 19-36.) This "out-of-state" "C" corporation scheme is a "plan or arrangement" pursuant to 6700. See U.S. v. Raymond, 228 F.3d 804, 811 (7th Cir. 2000), overruled on other grounds by Hill v. Tangherlini, 724 F.3d 965 (7th Cir. 2013) (a "plan or arrangement" that has some connection to taxes can fall under § 6700). Siegel filed documents establishing and maintaining the corporation, served as an officer in them, maintained corporate records for some, guided customers about what expenses to track to improperly claim as business expense deductions on tax returns he prepared, and drafted sham employment

contracts between the "C" corporation and the customers in order to avoid employment taxes. (Dkt. No. 1, Compl. ¶¶ 19-36.)  Second, Siegel made or caused to be made, false or fraudulent statements concerning the tax benefits of establishing a "C" corporation in Nevada.  (Id.)  Third, Plaintiff knew or had reason to know that statements he made were false as he tried to conceal the deductions he falsely claimed on tax returns for his customers.  For example, he lumped bogus business deductions on "C" corporation tax returns into single, large deductions categorized as supplies and office expenses to conceal them from the IRS.  (Dkt. No. 1, Compl. ¶ 42.)  Also, Siegel knew that characterizing income as royalty under sham "License Agreements" is improper because he admitted that it was "not a problem unless the IRS finds it."  (Id. ¶ 53.) Fourth, the fraudulent statements concerning the availability of tax deductions, credits or other mechanisms to reduce tax liability related to a material matter.  See U.S. v. Estate Pres.Servs., 38 F. Supp. 2d 846, 855 (E.D. Cal. 1998) (a matter is "material" if a "particular statement has a substantial impact on the decision-making process or produces a substantial tax benefit to a taxpayer").

Plaintiff also argues that Siegel violated I.R.C. § 6701 which provides that

> Any person--
> (1) who aids or assists in, procures, or advises with respect to, the preparation or presentation of any portion of a return, affidavit, claim, or other document,
> (2) who knows (or has reason to believe) that such portion will be used in connection with any material matter arising under the internal revenue laws, and
> (3) who knows that such portion (if so used) would result in an understatement of the liability for tax of another person, shall pay a penalty with respect to each such document in the amount determined under subsection (b).

I.R.C. § 6701.  The Court may enjoin persons who have engaged in conduct under § 6701 if the Court also finds that injunctive relief is appropriate to prevent recurrence of such conduct.  I.R.C. § 7408(b).

Here, Plaintiff advised his customers to participate in the out-of-state "C" corporation scheme and prepared fraudulent tax returns for them, and aided his customers in preparing documents used to implement the scheme.  Next, Siegel knew

[15cv643-GPC(WGV)]

or had reason to believe that these documents will be used in connection with a material matter arising under the internal revenue laws. The purpose of preparing these documents was to illegally deduct personal expenses as business expenses and evade the payment of employment taxes. Siegel should have been aware such conduct was illegal. Third, Siegel knew that his customers' income tax returns will result in an understatement of tax liability. In sum, Plaintiff has sufficiently alleged violations of both I.R.C. §§ 6700 and 6701.

Lastly, under both § 6700 and § 6701, the Court needs to consider the likelihood of future violations for purposes of an injunction. <u>See</u> I.R.C. § 7408(b). Courts may consider

> (1) the gravity of the harm caused by the offense; (2) the extent of the defendant's participation; (3) the defendant's degree of scienter; (4) the isolated or recurrent nature of the infraction; (5) the defendant's recognition (or non-recognition) of his own culpability; and (6) the likelihood that defendant's occupation would place him in a position where future violations could be anticipated.

<u>Estate Preserv. Servs.</u>, 202 F.3d at 1105.

First, the harm to the government is severe since the Siegel's fraud impedes the government's ability to assess and collect the true tax liabilities of Siegel's customers. There is also harm to Siegel's customers who are liable for taxes owed and potential penalties caused by Siegel. Lastly, there is harm to the public. Next, Siegel's involvement in organizing and implementing his tax fraud scheme is extensive as discussed above. Third, based on comments made to his customers, Siegel knew or had reason to know his conduct was unlawful. Fourth, the violations are part of a systematic and recurring practice since at least 2008. Fifth, Siegel has not recognized his own culpability. Sixth, Siegel is likely to commit future tax violations as he has not answered the complaint, and his multiple convictions of federal crimes in the 1990s, including tax evasion, has not deterred him from committing fraudulent tax returns or promoting abusive tax plans. Based on these factors, the Court finds that an injunction is necessary to prevent recurrence of his conduct.

[15cv643-GPC(WGV)]

ii.     I.R.C. § 7407

The second count seeks an injunction pursuant to I.R.C. § 7407.  The court may enjoin tax return preparers if the court finds

> (1) that a tax return preparer has--
> (A) engaged in any conduct subject to penalty under section 6694 or 6695, or subject to any criminal penalty provided by this title,
> (B) misrepresented his eligibility to practice before the Internal Revenue Service, or otherwise misrepresented his experience or education as a tax return preparer,
> (C) guaranteed the payment of any tax refund or the allowance of any tax credit, or
> (D) engaged in any other fraudulent or deceptive conduct which substantially interferes with the proper administration of the Internal Revenue laws, and
> (2) that injunctive relief is appropriate to prevent the recurrence of such conduct . . .

I.R.C. § 7407(b).

Here, the complaint alleges that Siegel has engaged in conduct subject to penalty under § 6694(a)(2)[1] by preparing federal tax returns for customers that contain unreasonable positions that he knows or reasonably should have known are unreasonable, and under 6694(b)(2)(A)[2] by willfully attempting to understate his customers' tax liabilities and recklessly disregarding IRS rules and regulations.  Siegel prepared fraudulent returns that claimed personal expenses as business deductions and entirely bogus deductions, understated customer income, and evaded payment of employment taxes.  In addition, Plaintiff engaged in conduct subject to penalty under I.R.C. § 6695(c)[3] by failing to accurately sign returns and by falsely furnishing preparer identification numbers ("PTIN") of other preparers on tax returns he prepared.

Second, he repeatedly misrepresented his education and experience as a tax preparer by falsely claiming to customers, the Government and the U.S. Tax Court that he is a C.P.A. and a lawyer.  He also engaged in fraudulent or deceptive conduct which

---

[1]I.R.C. § 6694(a)(2) addresses unreasonable positions for a tax preparer to take.

[2]I.R.C. § 6694(b)(2)(A) & (B) concerns "a willful attempt in any manner to understate the liability for tax on the return or claim," or "a reckless or intentional disregard of rules or regulations."

[3]I.R.C. § 6695(c) concerns the failure to furnish identifying number.

substantially interfered with the proper administration of the Internal Revenue laws. Siegel attempted to interfere with IRS examinations, provided false corporate records and bogus contracts to the IRS to support the positions he took on tax returns, filed customer tax returns without authorization, forged a customer signature on a U.S. Tax Court filing, forged the signatures of licensed attorneys on correspondence to the IRS, impersonated licensed attorneys on telephone calls with the IRS, and lied to IRS officials during U.S. Tax Court litigation when asked to confirm customer information. (Dkt. No. 1, Compl. ¶¶ 63, 64, 65, 67, 69, 70, 71.)   Lastly, as discussed above, injunctive relief is appropriate in order to prevent recurrence of Siegel's continued interference with the proper administration of the internal revenue laws.  The Court concludes that Plaintiff has sufficiently alleged facts to support an injunction pursuant to I.R.C. § 7407.

### iii.   I.R.C. § 7402

Finally, Plaintiff seeks an injunction pursuant to I.R.C. § 7402.  I.R.C. § 7402 allows the district court to issue injunctions "as may be necessary or appropriate for the enforcement of the internal revenue laws."  Id. § 7402(a).  The remedies . . .are in addition to and not exclusive of any and all other remedies of the United States in such courts or otherwise to enforce such laws."  Id. IRC § 7402(a) confers upon district courts "a broad range of powers to compel compliance with the tax laws," even "when such interference does not violate any particular tax statute." U.S. v. Ernst & Whinney, 735 F.2d 1296, 1300 (11th Cir.1984), cert. denied, 470 U.S. 1050 (1985).

Here, Plaintiff alleges that Siegel has engaged in conduct that substantially interferes with the administration and enforcement of the internal revenue laws, as detailed above, since at least 2008 and will highly likely continue to engage in such conduct unless enjoined.  Accordingly, injunctive relief under § 7402 is appropriate.

The Court concludes that Plaintiff has satisfied the second and third factors under Eitel and has pled sufficient facts to establish and success on its claims.

/ / / /

- 15 -

### 3.    Sum of Money at Stake

The Court next looks at the sum of money at stake.  See Eitel, 782 F.2d at 1471. The United States only seeks a permanent injunction.  Where there is no money at stake and only permanent injunction relief is sought, this factor weighs in favor of default judgment.  U.S. v. Barnes, No. CV 14-5621 SJF(PLAx), 2015 WL 2386190, at 6 (C.D. Cal. Apr. 3, 2015) (granting default judgment to permanently enjoin a tax return preparer).  Thus, this factor weighs in favor of default judgment.

### 4.    Possibility of a Dispute Concerning Material Facts

The fifth Eitel factor examines the likelihood of dispute between the parties regarding the material facts of the case.  Eitel, 782 F.2d at 1471-72.  "Where a plaintiff has filed a well-pleaded complaint, the possibility of dispute concerning material facts is remote."  Wecosign, Inc. v. IFG Holdings, Inc., 845 F. Supp. 2d 1072, 1082 (C.D. Cal. 2012).  Here, Plaintiff has set forth adequate allegations to support an injunction pursuant to I.R.C. §§ 7402, 7407, 7408.  Defendant has not responded to the complaint or any of Plaintiff's filings.  The Court finds that Defendant is unlikely to appear now to contest this matter, and therefore, this factor favors entry of default judgment.

### 5.    Whether the Default was Due to Excusable Neglect

The sixth Eitel factor examines whether Defendant's failure to respond can be attributed to excusable neglect.  See Eitel, 782 F.2d at 1472.  This factor weighs in favor of entry of default judgment where the defendant was properly served.  Landstar Ranger, Inc. v. Parth Enters., Inc., 725 F. Supp. 2d 916, 922 (C.D. Cal. 2010).  Plaintiff served Defendant based on an alternative service of process.  In its ex parte application for alternative service, Plaintiff discovered that Siegel is currently living and working in Israel and has no knowledge of his address in Israel.  (Dkt. No. 3-2, Patel Decl. ¶¶ 6, 9.)  Moreover, he is currently a fugitive from California authorities as the State of California filed a twenty count criminal complaint against Siegel in April 2014 for Med-Cal fraud, grand theft, forgery, identity theft, financial dependent adult abuse and tax evasion.  (Dkt. No. 3-10, Edelstein Decl., Ex. 1.)  There is an outstanding arrest

1  warrant for Siegel. (Dkt. No. 3-11, Edelstein Decl., Ex. 2.) Defendant's failure to

2  appear and litigate this matter is not likely based on excusable neglect. This factor

3  weighs in favor of default judgment.

4      **6.    Strong Policy Underlying the Federal Rules of Civil Procedure**

5          **Favoring Decisions on the Merits**

6          The final Eitel factor examines whether the strong policy favoring deciding cases

7  on the merits prevents a court from entering default judgment. Eitel, 782 F.2d at 1472.

8  Generally, default judgments are disfavored, and a case should be decided on the merits

9  when possible. Pena v. Seguros La Comercial, S.A., 770 F.2d 811, 814 (9th Cir. 1985).

10  However, where a defendant's failure to appear "makes a decision on the merits

11  impracticable, if not impossible," entry of default judgment is warranted. Pepsico, Inc.

12  v. Cal. Sec. Cans, 238 F. Supp. 2d 1172, 1177 (C.D. Cal. 2002). As Defendant has

13  failed to appear or respond in this matter, a decision on the merits is impossible.

14  Accordingly, the Court is not precluded from entering default judgment against

15  Defendant.

16          In sum, the Eitel factors weigh in favor of default judgment.

17  **C.    Permanent Injunction**

18          Having determined that default judgment should be granted, the Court must next

19  evaluate Plaintiff's request for relief. See Craigslist, Inc. v. Naturemarket, Inc., 694 F.

20  Supp. 2d 1039, 1061 (N.D. Cal. 2010). Here, as discussed above, Plaintiff has

21  demonstrated that a permanent injunction is warranted under I.R.C. §§ 7408, 7407,

22  7402 as to Siegel. Accordingly, the Court GRANTS Plaintiff's request for a permanent

23  injunction.

24  / / / /

25  / / / /

26  / / / /

27  / / / /

28  / / / /

1

## Conclusion

2        Based on the above, the Court GRANTS Plaintiff's motion for default judgment.

3  A separate order and judgment of permanent injunction shall be issued.  The hearing

4  set for November 13, 2015 shall be **vacated**.

5        IT IS SO ORDERED.

6

7  DATED:  November 9, 2015

8

9  HON. GONZALO P. CURIEL
   United States District Judge

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28